# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | |
|---|---|
| CHINOOK USA, LLC | CIVIL ACTION NO. 16-0113 |
| VERSUS | JUDGE ROBERT G. JAMES |
| DUCK COMMANDER INC., ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

Pending before the Court are cross motions: (1) Motion for Summary Judgment [Doc. No. 47] filed by Defendants Duck Commander, Inc. ("DC"), Dahlen Associates, Inc. ("Dahlen Associates"), 3292 Brands, LLC, ("3292 Brands"), Go-Time Energy, LLC ("Go-Time"), and Checkered Flag Business, LLC, ("Checkered Flag") (collectively "Defendants"); and (2) a Motion for Partial Summary Judgment [Doc. No. 48] filed by Plaintiff Chinook USA, LLC ("Chinook").

For the following reasons, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and Chinook's Motion for Partial Summary Judgment is DENIED.

## I.      FACTS

DC is a Louisiana Corporation with its principal place of business in West Monroe, Louisiana. DC is a corporation owned by the Robertson family, which originally manufactured and marketed duck calls and hunting-related merchandise. Prior to the agreement between Chinook and DC, the Robertson family starred in a reality TV series called "Duck Dynasty" on the A&E network. One of the key Robertson family members is Si Robertson ("Uncle Si"). Uncle Si's well-known affinity for iced tea led several beverage companies to approach DC about producing and licensing a Duck Commander/Uncle Si-branded iced tea beverage.

In mid-2013, DC began licensing its name to appear on a multitude of products. Chinook was

one of the companies interested in pursuing a license for DC-branded beverages. Chinook is a limited liability company formed for the purpose of bottling, marketing, and selling ready-to-drink beverages ("RTD").

DC retained Defendant Dahlen Associates to act as its licensing agent. Defendant 3292 Brands is a Louisiana Limited Liability Company formed by Dahlen Associates and the Robertsons and became the licensing agent for DC. Chinook submitted a licensing proposal to DC in September 2013.

Chinook and DC executed the Licensing Agreement ("Agreement") on January 7, 2014, with an effective date of October 23, 2013. [Doc. 1-2]. The Agreement granted Chinook a five-year exclusive right to license, manufacture, sell, and distribute DC-branded "Licensed Products." *Id.* at 2. "Licensed Products" are defined as "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages." *Id.* at 11. In return Chinook agreed to pay DC a royalty as set forth in Schedule A, paragraph 6, of the Agreement. *Id.* Additionally, Chinook agreed to pay DC a "Guaranteed Minimum Royalty" of $1,000,000.00 for each year of the contract. *Id.*

Schedule B of the Agreement was an endorsement provision for the personal endorsement of Si Robertson and "key Robertson family members." *Id.* at 13. In return for the personal endorsement from key Robertson family members, Chinook was to pay DC $1,000,000.00. *Id.* Included in the endorsement provision was "the support of Duck Commander and key Robertson family members and the support of their social media and public relations efforts when appropriate." *Id.* The first year of the provision contained a "Content Development/Social Media" component to launch the product. *Id.* The provision also included photo shoots, media interviews, commercial shoots, special appearances and planning meetings. *Id.*

2

The Agreement is governed by Louisiana law and contains an integration clause which states that the Agreement is the "entire understanding of the parties" and "shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement." *Id.* at 9. The Agreement required the product to be introduced on "April 30, 2014 or sooner if feasible if both parties agree." *Id.* at 12.

On February 13, 2014, DC and 3292 Brands held a meeting with Chinook representatives to discuss a potential marketing opportunity for Uncle Si's Iced Tea at the upcoming Duck Commander Texas 500 NASCAR race ("Duck Commander 500"). [Doc. No. 48-3, p. 6]. Chinook agreed to pay $1,000,000 of DC's $1,500,000 sponsorship fee for the race. *Id.* The product launch date was accelerated to April 5, 2014, in advance of the Duck Commander 500. *Id.* at 7.

On April 1, 2014, DC entered an agreement with Go-Time which granted Go-Time a three year "exclusive right" to license, manufacture, sell, and distribute "Duck Commander Go-Time Energy Shots." [Doc. No. 48-8, p. 11]. In exchange, Go-Time agreed to pay DC a $250,000 annual "Guaranteed Minimum Royalty" payment. *Id.*

On August 6, 2014, 3292 Brands provided to Chinook a proposal DC received from Checkered Flag to license a vitamin water and gave Chinook the opportunity to "propose on a similar product" before it made a decision to move forward with Checkered Flag on the proposal. [Doc. No. 47-4]. In an email dated September 3, 2014, David Salmon, President of Chinook, responded to 3292 Brands as follows: "[a]fter an extensive review of this category, we feel it is in Chinook USA's and our existing brands best interest to pass on the development of health supplement water." [Doc. No. 47-5].

On September 22, 2014, DC granted Checkered Flag a five-year non-exclusive license to sell

3

DC-branded "flavored bottled water and enhanced bottled water with multiple flavor options." [Doc. No. 48-7, p. 11]. The Checkered Flag agreement required Checkered Flag to pay an advance of $300,000 and a "Guaranteed Minimum Royalty" of $9,000,000 spread out over the five-year term of the contract. *Id.*

On January 25, 2016, Chinook filed the instant lawsuit seeking damages against Defendants alleging fraud in the inducement, breach of contract, breach of covenant of good faith, federal trademark infringements, civil conspiracy relating to tortious interference with a contract, tortious interference with a contract, unfair trade practices, and bankruptcy-related claims. [Doc. No. 1].

On March 31, 2016, DC answered Chinook's Complaint and asserted a counter-claim against Chinook. [Doc. No. 14]. DC asserts that Chinook failed to pay DC the minimum royalty payments and a personal endorsement fee in accordance with the Agreement. *Id.* at 11.

On April 22, 2016, the Court's Judgment dismissed Counts I, II, III and VII of Chinook's Complaint concerning bankruptcy-related matters and trademark claims. [Doc. No. 33].

On February 2, 2017, Chinook filed a Partial Motion for Summary Judgment [Doc. No. 48]. On February 20, 2017, Defendants filed a Memorandum in Opposition to the Partial Motion for Summary Judgment [Doc. No. 52]. On March 6, 2017, Chinook filed a Reply Memorandum [Doc. No. 54].

On February 2, 2017, Defendants filed a Motion for Summary Judgment [Doc. No. 47]. On February 23, 2017, Chinook filed a Memorandum in Opposition to the Motion for Summary Judgment [Doc. No. 53]. On March 7, 2017, Defendants filed a Reply Memorandum. [Doc. No. 55].

The Court is now prepared to rule on the outstanding motions.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.* at 322; *see also Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir. 1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).

In a bench trial, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *In re Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991). A court "has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* at 398 (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978)).

**B.     Chinook's Motion for Partial Summary Judgment [Doc. No. 48]**

Chinook contends it is entitled to partial summary judgment on its breach of contract claim against DC by (1) violating the exclusivity license and (2) failing to comply with the endorsement provisions. [Doc. No. 48].

To prove a breach of contract under Louisiana law, a party must show that: (1) the obligor had an obligation to perform; (2) the obligor failed to perform; and (3) the obligee sustained injury as a result of the obligor's failure to perform. *Favrot v. Favrot*, No. 1108-09 (La. App. 4 Cir. 2011), 68 So. 3d 1099, 1109.

1. **Exclusivity License**

Interpretation of the contract will often be necessary to determine whether there has been a breach. The goal of contract interpretation is to discover the common intent of the parties. LA. CIV. CODE art. 2045. The contract language is the starting point for determining that common intent. *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009). "The words of a contract must be given their generally prevailing meaning." LA. CIV. CODE art. 2047. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent. LA. CIV. CODE art. 2048.

"[A] contract is ambiguous when, *inter alia*, its 'written terms are susceptible to more than one interpretation,' when 'there is uncertainty as to its provisions, or when the parties' intent cannot be ascertained from the language used.'" *Greenwood 950, L.L.C. v. Chesapeake Louisiana, L.P.*, 683 F.3d 666, 668 (5th Cir. 2012); *McCarroll v. McCarroll*, 96–2700 (La.10/21/97), 701 So.2d 1280.

The interpretation of a contract typically presents a question of law that may be resolved by summary judgment. *Caddo Gas Gathering L.L.C. v. Regency Intrastate LLC*, 44-851 (La. App. 2 Cir. 11/12/2009); 26 So.3d 233, 235. However, if a court determines as a matter of law that a contract is ambiguous, then discerning the parties' intent becomes, in part, a question of fact, and summary judgment will rarely be appropriate. *See Carter v. BRMAP*, 90-1153 (La. App. 1 Cir. 11/22/1991); 591 So.2d 1184, 1188.

The Agreement granted Chinook a five-year exclusive right to license, manufacture, sell, and distribute DC-branded "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages." [Doc. No. 1-2, p. 11]. The Agreement fails to define "RTD Beverages." Chinook argues that it was granted an "exclusive" license for RTD beverages, and DC violated the Agreement when it entered into

7

agreements with Go-Time for energy shots and Checkered Flag for vitamin water. [Doc. No. 48-3, p. 12]. Chinook asserts that the energy shots and vitamin water are "RTD Beverages" because the vitamin water was sold in a prepared form, and the energy shots were ready for consumption. [Docs. No. 48-22, p. 7; 48-25, p. 4].

The Court finds that the term "RTD" contained in the Licensed Products section of Schedule A is ambiguous. [Doc. No. 1-2, p. 11].

DC argues that the intent of the parties, when they entered into the Agreement, was that the exclusivity was limited to RTD teas and coffees. [Doc. No. 52, p. 2]. Rachal Dahlen, who participated in the negotiations of the Agreement on behalf of Defendants, testified that the exclusivity was only for "unsweetened tea and sweet tea." [Doc. No. 47-9, p. 13]. "RTD category is-in licensing it's specific to coffee and tea. So the way that we interpret that is anything in those two categories." *Id.* at 13-14. Further, Ms. Dahlen testified that "in our business and per categorizations, RTD is a definition that we utilize when we're describing something where you would normally have to have another step. So that's why its utilized in iced teas and coffee almost exclusively . . ." *Id.* at 35. David Bolls was also involved in the negotiations of the Agreement for DC and avers that his intention at all times was to only grant Chinook the exclusivity to iced tea and or RTD coffee. [Doc. No. 58-4, p. 2].

Based on a plain reading of the contract, the term "RTD" is reasonably susceptible to either the definition proffered by Chinook or the one proffered by DC. Therefore, a genuine issue of material fact exists with respect to the meaning of "RTD" in the Agreement. Accordingly, on this

issue, Chinook's Motion for Partial Summary Judgment is DENIED.[1]

   2.   **Endorsement Provision**

Chinook asserts that DC failed to comply with the terms of the endorsement provision of the Agreement. [Doc. No. 48-3, p. 16]. Chinook contends that the filming schedule for the Duck Dynasty television show took first priority and made it virtually impossible to schedule the appearances required by the Agreement. *Id.* at 9. DC argues that when requested by Chinook it made every reasonable effort to fulfill Chinook's requests for appearances. [Docs. No. 52, p. 7; No. 47-9, p. 27].

The Agreement's endorsement provision provides:

Si Robertson and key Robertson family members involvement includes activities such as:

**Content Development | Social Media**: Year One for "content development" is critical to help launch promote and grow the Iced Tea brand.

Examples of activities include but are not limited to:

- YouTube Video Development
- 6-Second Vine Videos | Snapchat Video
- Instagram | Pinterest Photo Development
- Facebook Content Development
- Twitter Content (and Tweets or Re-Tweets from Uncle Si)
-Signing of select brand items (off-site — not event based)
- Quick customized welcome videos for Distributor Sales Pitches (primarily Quarter One/Year One)

---

[1] DC argues that Chinook waived its exclusive rights to produce energy shots. However, the Agreement specifically prohibited modifications unless the modification was in writing, signed by the parties, and referred to the Agreement. *See e.g.*, *Nat'l Am. Ins. Co. v. Melancon*, No. CIV. A. 98-1273, 1999 WL 675421, at *5 (E.D. La. Aug. 31, 1999); [Doc. No. 1-2, p. 10] ("[The Agreement] shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement."). Additionally, the party who asserts that an agreement has been modified must prove by a preponderance of the evidence facts or acts giving rise to the modification. LA. CIV. CODE. art. 1831; *Four Rivers Gaming, Inc. v. Reliable Amusement Co.*, 98-1581 (La. App. 3 Cir. 6/16/99), 737 So. 2d 938, 942, *writ denied*, 99-2027 (La. 10/29/99), 748 So. 2d 1166.

9

- Content for blogs (pre-determined)

. . .

**Media Interviews:** Up to ten 15 - minute interviews during first six months of launch. We will work closely with Duck Commander team to drive smart and strategic media exposure.

**Commercial Shoots:** One Shoot in the first 12 months, no more than 4 hours. Shoot will be in Monroe.

. . .

**Planning Meetings:** Two annual planning meetings with Robertson family members. Additional meetings will be handled by Dahlen team.

[Doc. No. 1-2, p. 13].

Chinook specifically alleges that DC "breached the endorsement provisions when it: 1) failed to create the required welcome videos for distributor sales pitches or any blog content promoting the product; 2) failed to complete the requisite number of interviews to promote the product; 3) failed to participate in a commercial for the product; and 4) failed to participate in the required annual meetings." [Doc. No. 48-3, p. 17].

First, Chinook claims that DC breached the Agreement by failing to create welcome videos or blog content. *Id.* Chinook refers to the deposition testimony of Willie Robertson to prove this contention. However, Willie Robertson testified that he was unaware whether any welcome videos or blog content were created. [Doc. No. 48-22, p. 9]. This evidence does not prove that DC failed to create welcome videos or blog content and is insufficient to satisfy Chinook's burden for obtaining relief on summary judgment. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).

Second, Chinook argues that DC breached the Agreement in failing to complete the requisite

number of interviews to promote the product. [Doc. No. 48-3, p. 17]. On April 5, 2014, the product launched, and Robertson family members had until October 5, 2014 to complete "[u]p to ten 15 - minute interviews." [Docs. No. 48-3, p. 7; No. 1-2, p. 13]. The Court notes that the Agreement provision uses the language "up to," which suggest a maximum number and not a required minimum number of media interviews. *See, e.g.*, *Treischel v. Astrue*, No. 11–cv–242 JJK, 2012 WL 473467, at *13 (D. Minn. Feb. 14, 2012) (interpreting the words "up to" to indicate "an upper limit, or maximum"); *see, e.g.*, *Terumo Americas Holding, Inc. v. Tureski*, No. CV 14-13838-DJC, 2015 WL 4529746, at *4 (D. Mass. July 27, 2015) ("The ordinary meaning of 'up to' is one of limitation, implying a maximum cap or limit."). Defendants claim that Robertson family members never refused a request for an appearance. [Docs. No. 52, p. 7; No. 47-9, p. 27]. The Court finds that Chinook is unable to prove as a matter of law that the Robertson family members failed to complete the requisite number of interviews to promote the product.

Chinook next claims that DC breached the Agreement by failing to have Si Robertson and key Robertson family members participate in a commercial for the product. [Doc. No. 48-3, p. 17]. Paul Cox ("Cox"), chairman of the Chinook board, stated in his deposition that no commercial shoot was done within the first 12 months of the launch of the product. [Doc. No. 48-21, p. 18]. Cox testified that although Chinook did not request the participation for a commercial shoot, "I don't think it was a prerequisite in Schedule B that we requested. It was just a commitment of them to do it." *Id.* However, Defendants argue that Chinook had the responsibility to request a Robertson family member for an appearance. [Doc. No. 47-9, p. 26-27; No. 52, p. 7]. Further, Defendants contend that Cox did not participate in the negotiations between Chinook and Dahlen or DC. [Doc. No. 47-2, p. 7].

The plain language of the Agreement states "**Commercial Shoots:** One Shoot in the first 12 months, no more than 4 hours. Shoot will be in Monroe." [Doc. No. 1-2, 13]. The Court finds that the Agreement is ambiguous as to what party must initiate the commercial shoots. As the non-moving party, the Court must accept Defendants' assertions as true. Therefore, the Court finds that a genuine issue of material fact exists as to whether DC or Chinook was mandated to set up the commercial shoot in Monroe, Louisiana.

Finally, Chinook argues that DC failed to have the Robertson family members participate in the required annual meetings. [Doc. No. 48-3, p. 17]. The only evidence that Chinook cites is Willie Robertson's deposition testimony in which he testified that he did not recall whether any meetings were conducted pursuant to the Agreement. [Doc. No. 48-22, p. 13]. This evidence is insufficient to satisfy Chinook's burden for obtaining relief on summary judgment. *See* FED. R. CIV. P. 56(c)(1).

The Court finds that genuine issues of material fact exist to determine whether DC violated the requirements of the exclusivity provision of the Agreement. Therefore, Chinook's Motion for Partial Summary Judgment [Doc. No. 48] is DENIED.

### C. Defendant's Motion for Summary Judgment

Defendants move for summary judgment on Chinook's claims in Count IV for fraudulent inducement, Count V for breach of contract, and Count VI for breach of the covenant of good faith. [Doc. No. 47-2, p. 10]. Additionally, Defendants assert that Chinook's claims in Count VIII for civil conspiracy relating to tortious interference with a contract and in Count IX for tortious interference with a contract should be dismissed on summary judgment. *Id.* at 20.

#### 1. Count IV--Fraud

First, Defendants argue that Chinook cannot meet its burden of proof for fraud and that

Chinook's allegations merely allege a breach of contract claim.

The United States Court of Appeals for the Fifth Circuit has set forth the following elements to sustain a claim for fraud under Louisiana law: (1) a misrepresentation of material fact; (2) made with the intent to deceive; and (3) causing justifiable reliance with resultant injury. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1131 n. 33 (5th Cir. 1988), *vacated on other grounds sub nom.*, *Fryar v. Abell*, 492 U.S. 914 (1989). While a fraud claim based on unfulfilled promises or statements as to future events will not satisfy the justifiable reliance requirement, a claim of fraud may be predicated on promises made with the intention not to perform at the time the promise is made. *Sun Drilling Prods. Corp. v. Rayborn*, 798 So.2d 1141, 1152 (La. App. 2001). There must be an intent to defraud and actual or potential loss or damage. *Id.*

In order for the Court to determine whether DC made fraudulent misrepresentations to Chinook, the Court must examine the facts and decide whether DC simply made unfulfilled promises, or whether DC never intended to honor the alleged misrepresentations it made to Chinook.

Chinook claims that DC, along with 3292 Brands and Dahlen Associates acting as DC's agents, fraudulently induced Chinook to enter into the Agreement "because they knew that the Robertson family's filming obligations would prevent Duck Commander from satisfying the endorsement provisions of the Licensing Agreement." [Doc. No. 53, p. 20]. Chinook contends that, despite the knowledge that filming the Robertson's television show would take first priority and would take up the majority of their availability, they agreed to perform numerous endorsement activities which DC knew they could not complete. *See* [Doc. No. 48-11, p. 5].

Defendants argue that these allegations are insufficient to prove fraud in the inducement. To the extent that Defendants contend that Chinook's allegations are legally insufficient to support a

fraud claim as a matter of law, the Court disagrees. Further, as the moving party on summary judgment, Defendants have failed to present any evidence to establish their entitlement to judgment in their favor. Therefore, the Court finds that Defendants' Motion for Summary Judgment as to Chinook's fraud claim is DENIED.

### 2. Count V--Breach of Contract

Next, Defendants seek summary judgment on Chinook's claims in Count V for breach of contract. [Doc. No. 47-2, p. 18]. Defendants argue that "Chinook cannot meet its burden of proof that the parties intended to include Energy Shots or Health Supplement/Vitamin Water in the definition of RTD teas or RTD beverages." *Id.* at 19. As stated earlier, the Court finds that the term "RTD" contained in the Licensed Products section of Schedule A is ambiguous and that a genuine issue of material fact exists with respect to the meaning of "RTD" in the Agreement. *See* discussion *supra* Section I.B.1; [Doc. No. 1-2, p. 11].

Defendants also argue that Chinook is unable to sustain its burden to prove that any breach of the Agreement caused it to suffer damages of lost profits. [Doc. No. 47-2, p. 22]. Chinook contends that it suffered damages of lost profits and out-of-pocket losses. [Doc. No. 53, p. 23].

A plaintiff alleging breach of contract under Louisiana law "has the burden of proving damage and its amount." *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 293-94 (5th Cir. 2012) (citation omitted). Indeed, "proof of damages is an essential element to a breach of contract claim." *Sanga v. Perdomo*, 167 So.3d 818, 822 (La. App. 5 Cir. 2014).

"As a general rule damages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty. Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and

14

mathematical certainty or precision is not required." *Brecheen v. News Grp., L.P.*, 105 So. 3d 1011, 1029-30 (La. App. 5th Cir. 2012), *citing La Louisiane Bakery Co., Ltd. v. Lafayette Ins. Co.*, 61 So.3d 17, 34 (La. App. 5th Cir. 2011), *writ denied sub nom. La Louisiane Bakery Co., Ltd. v. Lafayette Ins. Co.*, 62 So.3d 95 (La. 2011). "[T]he absence of independent, corroborating evidence [of the lost profits] may not be fatal to the plaintiff's burden of proof." *Id.* at 1030 (internal quotation marks and citations omitted).

Defendants argue that Chinook bases its claim for lost profits on speculation and conjecture. However, Chinook has provided evidence of lost profits from cash flow statement projections. [Docs. No. 53, p. 22; No. 1-2 p. 11]. "In cases where direct evidence is not available to establish the exact extent of loss caused by a breach of contract, resort to customary or foreseeable profit as a measure of damages is proper." *Babcock*, 703 F.3d at 293 (citation omitted).Therefore, the Court finds that Chinook has raised a genuine issue of material fact for trial on the lost profits damages it allegedly suffered. Defendant's Motion for Summary Judgment is DENIED to the extent it seeks dismissal of Chinook's breach of contract claim.

### 3. Count VI--Breach of Covenant of Good Faith

While Defendants state that "Chinook fails to specifically allege any facts that are required to establish Fraud, Breach of Contract or Breach of Covenant of Good Faith," Defendants fail to allege any evidence to support summary judgment on Chinook's breach of covenant of good faith. [Doc. No. 47-2, p. 15]. Thus, to the extent Defendants seek to dismiss Chinook's breach of covenant of good faith claim it is **DENIED**.

### 4. Count VIII--Tortious Interference & Count IX--Civil Conspiracy

Finally, Defendants assert that Chinook's claims for civil conspiracy relating to tortious

interference with a contract and tortious interference with a contract should be dismissed on summary judgment. [Doc. No. 47-2, p. 20]. Defendants, without citation to any law, contend that Chinook should be barred from asserting claims for civil conspiracy and tortious interference with a contract because Chinook communicated in writing that it was passing "on the development of a health supplement water."

### a. Tortious Interference With a Contract

Chinook contends that DC, Checkered Flag, and 3292 Brands conspired to commit tortious interference. [Doc. No. 53, p. 22]. DC asserts that Chinook's tortious interference with a contract claim can only be asserted against an officer of a private corporation and cannot be asserted against a corporate entity defendant. [Doc. No. 47-2, p. 21].

The Fifth Circuit has recognized that the Louisiana cause of action for tortious interference with a contract is very narrowly drawn. *Petrohawk Properties, L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380, 395–96 (5th Cir. 2012). The Fifth Circuit specified that in order to make out such a claim, the plaintiff must identify a "narrow, individualized duty between the plaintiff and the alleged tortfeasor." *Id.* The Louisiana Supreme Court first recognized a Louisiana cause of action for tortious interference with contract in *9 to 5 Fashions, Inc. v. Spurney*. 538 So. 2d 228, 231–34 (La. 1989). Relying on Article 2315 of the Louisiana Civil Code, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it," the Louisiana Supreme Court found that a plaintiff may have a cause of action for tortious interference with contract against an officer of a corporation who interfered with a contract between that corporation and the plaintiff. *Id.*; LA. CIV. CODE ANN. art. 2315. The Louisiana Supreme Court was careful to limit its holding narrowly to the facts of that case:

> In the present case we recognize, as set forth particularly herein, only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.

*Spurney*, 538 So. 2d at 234.

The Fifth Circuit has held, however, that the Louisiana Supreme Court did not exclude the possibility that, on other facts, Louisiana law might recognize a duty on other individuals or entities not to interfere with third-party contracts. *American Waste & Pollution Control Co. v. Browning–Ferris, Inc.*, 949 F.2d 1384, 1387–88 (5th Cir. 1991) (noting that it is a question of law whether such a duty exists under LA. CIV.CODE ANN. art. 2315). Surveying the Louisiana jurisprudence, the Fifth Circuit has concluded that whether a cause of action for tortious interference lies turns on the nature of the duty the tortfeasor allegedly owes to the plaintiff. *Id.* at 1386–91. If a "narrow, individualized duty" is alleged, the plaintiff may have a cause of action; but if only "broad and amorphous duties" are said to bind the tortfeasor to the plaintiff, the plaintiff will have no claim. *Petrohawk Properties*, 689 F.3d at 395–96.

Chinook's action is against Defendant entities, not their officers; thus it does not match up perfectly with the set of facts in *Spurney*. Furthermore, the Court finds that Chinook has failed to plead a duty that is sufficiently narrow to support an extension of the duty found in *Spurney* to the instant facts. In fact, Chinook admits that it has abandoned its tortious interference claim. [Doc. No. 53, p. 22 n.16]. Accordingly, Defendants' Motion for Summary Judgment on this claim is GRANTED.

### b. Civil Conspiracy

To prevail on a claim of civil conspiracy, Chinook must prove "that an agreement existed to commit an illegal or tortious act which resulted in the plaintiff's injury." *Butz v. Lynch*, 710 So. 2d

17

1171, 1174 (La. Ct. App. 1998). The plaintiff must prove "that there was an agreement as to the intended outcome or result." *Id.* The actionable element in a conspiracy claim "is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually did commit in whole or in part." *Id.*; *see also Aranyosi v. Delchamps, Inc.*, 739 So. 2d 911, 917 (La. Ct. App. 1999) (same). Chinook has been unable to prove that it could recover for tortious interference with a contract as a matter of law and has since abandoned the claim. [Doc. No. 53, p. 22 n.16]. Since Chinook cannot establish the substantive offense, it cannot maintain a cause of action for conspiracy to commit the said offense. Accordingly, Defendants' Motion for Summary Judgment on Chinook's conspiracy claim is also GRANTED.

### III. CONCLUSION

Chinook's Motion for Partial Summary Judgment [Doc. No. 48] is DENIED. Defendants' Motion for Summary Judgment [Doc. No. 47] is GRANTED IN PART and DENIED IN PART. To the extent that Defendants move for summary judgment as to Chinook's tortious interference with a contract and civil conspiracy claims, their motion is GRANTED, and those claims are DISMISSED WITH PREJUDICE. The motion is otherwise DENIED.

MONROE, LOUISIANA, this 2nd day of May, 2017.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE