# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| CHINOOK USA, LLC | CIVIL ACTION NO. 16-0113 |
| VERSUS | JUDGE ROBERT G. JAMES |
| DUCK COMMANDER INC., ET AL. | MAG. JUDGE KAREN L. HAYES |

## OPINION

This is a breach of contract case brought by Chinook, USA, LLC ("Chinook") against

Defendants Duck Commander ("DC"), Dahlen Associates, Inc. ("Dahlen Associates"), 3292

Brands, LLC, ("3292 Brands"), Go-Time Energy, LLC ("Go-Time"), and Checkered Flag

Business, LLC, ("Checkered Flag") (collectively "Defendants") arising from a licensing

agreement entered into by Chinook and DC.

A bench trial was held June 5, 2017, through June 6, 2017, and the Court took the matter

under advisement.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court hereby enters the following findings of fact and conclusions of law. To the

extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such,

and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts

it as such.

### A. FINDINGS OF FACT

DC is a Louisiana Corporation with its principal place of business in West Monroe,

Louisiana. DC is a corporation owned by the Robertson family, which originally manufactured

and marketed duck calls and hunting-related merchandise. Prior to the agreement between

Chinook and DC, the Robertson family starred in a reality TV series called "Duck Dynasty" on the A&E network. One of the key Robertson family members is Si Robertson ("Uncle Si"). Uncle Si's well-known affinity for iced tea led several beverage companies to approach DC about producing and licensing a Duck Commander/Uncle Si-branded iced tea beverage.

In mid-2013, DC began licensing its name to appear on a multitude of products. Chinook was one of the companies interested in pursuing a license for DC-branded beverages. Chinook is a limited liability company formed for the purpose of bottling, marketing, and selling ready-to-drink beverages ("RTD").

Paul Cox ("Cox") owned and operated a venture capital firm, Cox Venture, that provided funding to Chinook for the Uncle Si's Iced Tea venture. Cox served on Chinook's Board of Directors. Mark Gunderson ("Gunderson") acted as Chinook's Chief Marketing Officer, Joe Regazzo acted as Chinook's Director of Sales, and David Salmon ("Salmon") acted as Chinook's President and Chief Operating Officer at all relevant times.

DC retained Defendant Dahlen Associates to act as its licensing agent. Defendant 3292 Brands is a Louisiana Limited Liability Company formed by Dahlen Associates and Korie Robertson. 3292 Brands became the licensing agent for DC and was responsible for ensuring DC did not grant overlapping or conflicting licenses. David Bolls ("Bolls") acted as Chief Operating Officer for DC at all relevant times.

Chinook submitted a licensing proposal to DC in September 2013. After selecting Chinook's proposal, DC presented Chinook with its form licensing agreement. The negotiations between the two parties were conducted by Gunderson, Trey Fisher and Salmon on behalf of Chinook, and Rachel Dahlen ("Dahlen"), Scott Headington, Korie Robertson, and Bolls on behalf

of DC.

Chinook and DC executed the Licensing Agreement ("Agreement") on January 7, 2014, with an effective date of October 23, 2013. The Agreement granted Chinook a five-year exclusive right to license, manufacture, sell, and distribute DC-branded "Licensed Products." "Licensed Products" are defined as "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages." In return Chinook agreed to pay DC a royalty as set forth in Schedule A, paragraph 6, of the Agreement. Additionally, Chinook agreed to pay DC a "Guaranteed Minimum Royalty" of $1,000,000.00 for each year of the contract.

Schedule B of the Agreement is an endorsement provision for the personal endorsement of Uncle Si and "key Robertson family members." In return for the personal endorsement, Chinook agreed to pay DC $1,000,000.00. The endorsement provision included "the support of Duck Commander and key Robertson family members and the support of their social media and public relations efforts when appropriate."

The Agreement is governed by Louisiana law and contains an integration clause which states that the Agreement is the "entire understanding of the parties" and "shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement." The Agreement required the product to be introduced on "April 30, 2014 or sooner if feasible if both parties agree."

On January 13, 2014, Chinook made a $250,000 advance royalty payment to Dahlen as agent for DC.

On February 13, 2014, DC and 3292 Brands held a meeting with Chinook representatives to discuss a potential marketing opportunity for Uncle Si's Iced Tea at the upcoming Duck

Commander Texas 500 NASCAR race ("Duck Commander 500"). Chinook agreed to pay $1,000,000 of DC's $1,500,000 sponsorship fee for the race. The product launch date was accelerated to April 5, 2014, in advance of the Duck Commander 500.

On April 1, 2014, DC entered an agreement with Go-Time which granted Go-Time a three year "exclusive right" to license, manufacture, sell, and distribute "Duck Commander Go-Time Energy Shots." In exchange, Go-Time agreed to pay DC a $250,000 annual "Guaranteed Minimum Royalty" payment.

On April 6, 2014, Dahlen approached Cox at the Duck Commander 500 to inquire into whether Chinook had any interest in possibly pursuing energy shots. Cox declined an opportunity to create any product other than tea at that time. At the Duck Commander 500, Salmon expressed to Dahlen and Bolls that Chinook would appreciate an opportunity to be notified of any future offers DC received on beverage products. The Robertsons were present at the Duck Commander 500 on April 6th, the day it was to be held, but the race had to be rescheduled due to a rain delay until the next day. The Robertsons left late April 6th and were not present at the actual race because of filming obligations with A&E.

On April 25, 2014, Gunderson requested Uncle Si's appearance at the Kentucky Derby which was to be held on May 3, 2014. Uncle Si declined because the request was on short notice and he had scheduling conflicts.

On May 5, 2014, Willie Robertson was asked to conduct a CNBC interview promoting the tea the next day in Shreveport, Louisiana. Willie Robertson declined the interview, citing the distance in traveling on short notice. Willie Robertson attempted to reschedule for the following week, but did not conduct the interview.

On May 16, 2014, Salmon sent a letter to Bolls asking him to confirm that Chinook had an exclusive license over the "Licensed Products." On the same day, Bolls replied, "[t]hank you for taking the time to ask for a confirmation of Chinook USA's rights as our exclusive licensee of tea in single serve and food service channels. This email confirms the same."

On or around June 28, 2014, Chinook made a transfer of $250,000 to 3292 Brands as agent for DC.

Cox testified that after the initial good reception for the product, sales numbers became flat in the summer of 2014 and "[w]e didn't see the growth that we had hoped."

On August 6, 2014, 3292 Brands provided to Chinook a proposal DC received from Checkered Flag to license a vitamin water and gave Chinook the opportunity to "propose on a similar product" before it made a decision to move forward with Checkered Flag. Additionally, 3292 Brands attached an "Amendment to the contract that will give Chinook first right of refusal going forward for the RTD Beverage Category within 10 days of notification of a pending deal." On September 2, 2014, Bolls relayed to Dahlen that Chinook's number of days to review the vitamin water proposal had passed and "we are clear to move forward without them."

On September 3, 2014, Salmon sent an email to Scott Headington expressing his gratitude for contacting him about being approached with an offer for licensing a health supplement water and stating that "[a]fter an extensive review of this category, we feel it is in Chinook USA's and our existing brands best interest to pass on the development of a health supplement water." Salmon went on to state that Chinook's board felt there was no need to add an amendment to the Agreement. Salmon explained, "[w]e understand from time-to-time 3292 Brands and Duck Commander may be approached by a potential licensee about a product that falls within our

existing agreement and that you will contact us about the opportunity."

On September 15, 2014, Dahlen sent an email to Korie Robertson stating that:

we would like to have Chinook sign a clear definition of RTD instead of the first right of refusal. They created a stink over the Energy Shot and we can't have that continue to happen every time we want to do a liquid product. We also drafted that first right of refusal at their request to be good partners and they have decided not to sign it, which is fine with us.

On September 22, 2014, DC granted Checkered Flag a five-year non-exclusive license to sell DC-branded "flavored bottled water and enhanced bottled water with multiple flavor options." [Doc. No. 48-7, p. 11]. The agreement required Checkered Flag to pay an advance of $300,000 and a "Guaranteed Minimum Royalty" of $9,000,000 spread out over the five-year term of the contract. *Id.*

On or around September 26, 2014, Chinook made a transfer of $250,000 to 3292 Brands as agent for DC.

On October 8th, 9th, and 10th, 2014, Willie Robertson made an appearance on behalf of DC at the National Association of Convenience Stores Show in Las Vegas. Chinook had requested an appearance by Uncle Si, but instead a video of Uncle Si promoting the tea played on a loop at the convention.

On November 6, 2014, a meeting was held between representatives of DC and Chinook. Present on behalf of Chinook were Cox, Salmon, Gunderson, and Chinook board member Dennis Frankenberger. Present on behalf of DC were Bolls and Kyle Tengwall.

Following the meeting, Cox asked Dennis Frankenberger to draft a report of the meeting. On November 10, 2014, the report was sent to certain Chinook employees, indicating that DC was receptive to the fact that Chinook had not wired the scheduled licensee fee to DC because of

DC's inability to comply with Schedule B. Additionally, it was discovered that an energy shot was being licensed by DC. On that same day, Salmon replied that DC was "very receptive to our proposals and willing to look at potential revisions to our agreement." Further, Salmon went on to state:

> to the best of my knowledge and from information provided by David Bolls we passed on the Duck Commander Energy Shot back in April at the Duck Commander 500. After being made aware that the product was on the market this past July I contacted David Bolls with my concern about the product. David informed me that comments made by Paul at the Duck Commander 500 were interpreted by Rachel Dahlen and Scott Headington that Chinook USA had no interest or intention in pursuing an Energy Shot product. I believe their understanding was that they addressed it with us and we passed. After being informed of this by David Bolls, I told David that in the future they must come to us formally in writing when checking our interest in pursuing new opportunities related to our RTD exclusivity.

At a December 2014 meeting, Cox was introduced to Terry Griffin who proposed to take over Chinook's exclusivity license and have Cox placed in a minority position to recoup his losses. Cox ultimately declined that proposal.

In a letter dated January 21, 2015, the licensing agreement between Checkered Flag and DC was terminated by the parties.

On January 25, 2016, Chinook filed the instant lawsuit seeking damages against Defendants alleging fraud in the inducement, breach of contract, breach of covenant of good faith, federal trademark infringements, civil conspiracy relating to tortious interference with a contract, tortious interference of a contract, unfair trade practices, and bankruptcy-related claims. [Doc. No. 1].

On March 28, 2016, 3292 Brands answered Chinook's Complaint. [Doc. No. 11].

On March 31, 2016, DC answered Chinook's Complaint and asserted a counter-claim

against Chinook. [Doc. No. 14]. DC asserts that Chinook failed to pay DC the minimum royalty payments and a personal endorsement fee in accordance with the Agreement. *Id.* at 11.

On April 5, 2016, Dahlen Associates, Checkered Flag, and Go-Time answered Chinook's Complaint. [Docs. No. 19, 20, & 21].

On April 22, 2016, the Court's Judgment dismissed Counts I, II, III and VII of Chinook's Complaint concerning bankruptcy-related matters and trademark claims. [Doc. No. 33].

On February 2, 2017, Chinook filed a Motion for Partial Summary Judgment [Doc. No. 48], and Defendants filed a Motion for Summary Judgment [Doc. No. 47]. On May 2, 2017, the Court ruled on the cross motions for summary judgment, denying Chinook's Motion for Partial Summary Judgment and granting in part and denying in part Defendants' Motion for Summary Judgment. The Court dismissed Chinook's tortious interference with a contract and civil conspiracy claims.

**B.    CONCLUSIONS OF LAW**

The Court applies substantive state law in a diversity action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see ACS Constr. Co., Inc. of Miss. v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003) ("We look to state law for rules governing contract interpretation."). In addition, Section 16 of the Agreement provides that the Agreement "shall be governed in accordance with the laws of the State of Louisiana." Accordingly, the Court interprets the Agreement in accordance with Louisiana law.

Chinook's remaining claims include claims for breach of contract, breach of covenant of good faith, fraud in the inducement, and for unfair trade practices.

1.      **Breach of Contract**

First, Chinook's complaint contains claims against all Defendants for breach of contract. However, Chinook only presented evidence of an agreement with DC and did not allege any breach of contract by other Defendants. Therefore, Chinook has abandoned its breach of contract claims against all Defendants with the exception of DC.

To prove a breach of contract under Louisiana law, a party must show that: (1) the obligor had an obligation to perform; (2) the obligor failed to perform; and (3) the obligee sustained injury as a result of the obligor's failure to perform. *Favrot v. Favrot*, No. 1108-09 (La. App. 4th Cir. 2011), 68 So. 3d 1099, 1109. In a breach of contract case, the burden of proof of the elements of recovery is on the plaintiff. *See Sam's Style Shop v. Cosmos Broad. Corp.*, 694 F.2d 998, 1004 (5th Cir. 1982).

a.      **Exclusivity Provision**

The Agreement granted Chinook a five-year exclusive right to license, manufacture, sell, and distribute DC-branded "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages." [Doc. No. 1-2, p. 11]. The Agreement fails to define "RTD Beverages." Chinook argues that it was granted an "exclusive" license for RTD beverages, and DC violated the Agreement when it entered into agreements with Go-Time for energy shots and Checkered Flag for vitamin water. As the Court noted in its previous Ruling [Doc. No. 66], the term "RTD Beverages" in the Agreement is ambiguous.

"Contracts have the effect of law for the parties" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." *Marin v. Exxon Mobil Corp.*, 09–2368 (La.10/19/10), 48 So.3d 234, 258; La. Civ. Code. arts. 1983 and 2045. When a contract term is

ambiguous, the court must turn to the rules of construction outlined in the Civil Code to determine the meaning of the contract within the "four corners" of the document. *Brown v. Drillers, Inc.*, 630 So.2d 741, 748 (La. 1994); *Hettig & Co. v. Union Mut. Life Ins. Co.*, 781 F.2d 1141, 1143 (5th Cir. 1986) (citations omitted).

The Civil Code sets forth a number of factors to consider in determining which possible meaning accurately reflects the intent of the parties. Importantly, "[a] doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV. CODE art. 2053. Additionally, "the contract must be construed as a whole and in light of attending events and circumstances." *See Brown*, 630 So.2d at 748; *see also* LA. CIV. CODE art. 2050 ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."). As a last resort, ambiguous terms should be construed against the drafter. LA. CIV. CODE art. 2056.

"The Court may consider extrinsic evidence as to the parties' intent only if the contract is ambiguous." *Thorne v. Bard Peripheral Vascular, Inc.*, No. 16-0262, 2016 WL 3746148, at *4 (E.D. La. July 13, 2016) (citing *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002)); *see also Gebreyesus v. F.C. Schaffer & Assocs., Inc.*, 204 F.3d 639, 643 (5th Cir. 2000).

Dahlen, who participated in the negotiations of the Agreement on behalf of DC, testified that the exclusivity was only for "unsweetened tea and sweet tea." "RTD category is-in licensing it's specific to coffee and tea. So the way that we interpret that is anything in those two categories." Further, Dahlen testified that

> [I]n our business and per categorizations, RTD is a definition that we utilize when we're describing something where you would normally have to have another step.

10

So that's why its utilized in iced teas and coffee almost exclusively is because normally you would have to prepare coffee or you'd have prepare iced tea with leaves or beans. . . . In all discussions that we had with Chinook we talked about tea, iced tea, 95 percent of the time . . . . Then the other 5 percent of the time we talked about the progression into coffee beverages that were the same.

Bolls testified that, based on his conversations with Salmon, the Agreement covered iced tea and ready-to-drink tea products.

Cox testified that it was his understanding that Chinook was interested in making a multitude of Duck Commander products, not just teas and coffees. However, he was not personally involved in the negotiations. Cox also testified in his deposition that he relied upon the Agreement for the definition of RTD Beverages and that Salmon did not relay to him a specific definition. Notably absent was Salmon's testimony on the definition of RTD Beverages in the Agreement.

Willie Robertson testified that an RTD beverage was a ready-to-drink drinkable liquid; however, he did not participate in the negotiation of the Agreement and stated he had not read the Agreement.

Chinook contends that the terms, "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages," contemplates that the agreement covered more than just teas. Chinook argues that the agreement had to cover other drinks than RTD teas, because otherwise the language "RTD Beverages" would have been superfluous. Korie Robertson, Dahlen, and Bolls testified that the meaning "RTD Beverages" was understood to encapsulate possible coffees Chinook would create in the future.

The Court notes that the Agreement is a standard form provided by DC. However, there was conflicting testimony on which party submitted the ambiguous term RTD Beverages. Before

the contract was reduced to writing, a deal memo was created. Bolls testified that it was normal practice to have both sides negotiate the terms of the deal memos. Cox testified that DC provided the term RTD Beverages in the contract. Bolls testified that the term RTD Beverages was submitted by David Salmon.[1]

Chinook also argues that it has cited several federal decisions addressing what RTD beverages mean. However, upon review of Chinook's cited cases, not one opinion definitively refers to or defines "RTD Beverage" as used in the non-alcoholic beverage industry. As Dahlen explained in her testimony, RTD can also refer to tequila or margarita mixes in the alcoholic beverage industry. Here, the parties only negotiated for RTD non-alcoholic beverage exclusivity.

In *Book v. Schoonmaker*, the Louisiana Supreme Court, in discerning the intent of the parties, relied on testimony which related several conversations between the parties. 210 La. 94, 102 (La. 1946). From this, the court made its determination of the parties' intent based on the manner in which the parties had operated under the agreement.

Chinook argues that DC proposed an amendment to the Agreement because DC knew that the vitamin water fell into the category of products for which Chinook had an exclusive license. Dahlen testified that DC did not consider the energy shot with Go-Time to be within the definition of RTD Beverages and explains:

> [W]e had a clear definition of what [RTD Beverage] was. Velocity Go Time Energy shot was not in that space at all. It is an energy supplement. And the stink that was caused was really initiated when [Chinook] saw that the shot had an iced tea flavoring. . . . So they expressed their concern over the flavor, and that's the first time that we were aware that their definition of RTD was different than ours.

---

[1]The Court has resolved the meaning of the term by applying other general rules of construction in the Louisiana Civil Code; therefore, it is not necessary to determine who the drafter was. *See Hebert v. Webre*, 2008-0060 (La. 5/21/08), 982 So.2d 770, 774.

Bolls testified that Dahlen and Salmon spoke at the Duck Commander 500 regarding the possible conflict with Go-Time.

Q:   Did [Salmon] express to you that their feelings were hurt because y'all had licensed another product?

A:   Yes.

Q:   Did he dispute that with you?

A:   He did not dispute that.

Q:   Did he ask you that in the future that they have the opportunity to at least look at products?

A:   Yes. He asked as a professional courtesy.

Q:   Of any beverage, not just RTD beverages?

A:   That's correct.

Q:   Were you in agreement to give them that opportunity?

A:   Yes. We didn't have an obligation to do it, but we were going to do it for, you know to be good stewards of the relationship.

DC representatives attempted to have Chinook sign a right of first refusal for RTD beverages; however, Chinook declined. Cox testified that he believed the amendment was proposed by DC to remove his exclusivity in order to complete deals with other companies. Dahlen and Bolls both testified that DC drafted the amendment to the Agreement for a first right of refusal at Chinook's request "to be good partners."

Both sides had representatives testify that the parties contemplated that additional products after Uncle Si's Iced Tea would be created under the Agreement. Cox and Sherri Radler testified that Chinook planned to expand its product line beyond iced tea. Korie Robertson and

Bolls testified that the other products would be additional flavors of tea.

On May 16, 2014, Bolls sent an email with the most clear evidence of what the parties intended by the term RTD Beverages: "[t]hank you for taking the time to ask for a confirmation of Chinook USA's rights as our exclusive licensee of tea in single serve and food service channels. This email confirms the same." Chinook did not dispute this interpretation of the contract until months later, after sales became stagnant.

Chinook and DC both supplied the Court with documents, made after the negotiation of the parties, to support their different interpretations of RTD Beverages. However, the undisputed testimony of the individuals **who were actually involved in the negotiations of the Agreement** is that the term "RTD Beverages" constituted only teas and coffees. Applying the pertinent rules of contract interpretation to the evidence presented in this case, the Court finds that the parties to the Agreement intended "RTD Beverages" to be limited to teas and coffees in a prepared form.[2]

Therefore, Chinook is unable to carry its burden of proving that vitamin water and energy shots were contained within the definition of RTD Beverages in the Agreement and that a breach of the exclusivity provision of the Agreement occurred.

**b.       Endorsement Provision**

Chinook also contends that DC violated Schedule B of the Agreement. Chinook contends that the filming schedule for the Duck Dynasty television show took first priority and made it

---

[2] The Court rejects Chinook's argument that there was no meeting of the minds between the two parties during formation of the Agreement. Defendants provided uncontradicted testimony that the individuals negotiating the contract were aware of and understood the definition of RTD Beverages. Chinook presented testimony that only interpreted what the parties might have understood the term to mean, not what the parties actually understood the term to mean at the formation of the Agreement.

virtually impossible to schedule the appearances required by the Agreement. DC argues that when requested by Chinook it made every reasonable effort to fulfill Chinook's requests for appearances. DC also notes that Chinook paid DC only $500,000 of the agreed $1,000,000 pursuant to Schedule B.

Cox testified that he did not know about A&E's first priority over the Robertson family's time. However, Dahlen and Korie Robertson both testified that Salmon, who negotiated the Agreement on behalf of Chinook, was aware and had been instructed on A&E's first priority over the Robertson family's time.

The Agreement's endorsement provision found in Schedule B provides, in pertinent part:

Si Robertson and key Robertson family members involvement includes activities such as:

**Content Development | Social Media:** Year One for "content development" is critical to help launch promote and grow the Iced Tea brand.

Examples of activities include but are not limited to:

- YouTube Video Development
- 6-Second Vine Videos | Snapchat Video
- Instagram | Pinterest Photo Development
- Facebook Content Development
- Twitter Content (and Tweets or Re-Tweets from Uncle Si)
-Signing of select brand items (off-site — not event based)
- Quick customized welcome videos for Distributor Sales Pitches (primarily Quarter One/Year One)
- Content for blogs (pre-determined)

*As the face of the brand, our goal is to drive direct association with Uncle Si and the tea, it's very important Year 1 & 2 that we tell the brand story through meaningful quick video and pictures. We will bundle content requests to maximize Uncle Si's time. Our goal is to build the Duck Commander Iced Tea brand into a brand that sustains revenue for many decades to come.*

Included in the agreement is the support of Duck Commander and key Robertson family members and the support of their social media and public relations efforts

when appropriate.

**Photo Shoots:** One photoshoot **in the first 6 months, no more than 4 hours. Shoot will be in Monroe.**

**Media Interviews:** Up to ten 15 - minute interviews during first six months of launch. We will work closely with Duck Commander team to drive smart and strategic media exposure.

**Commercial Shoots:** One Shoot in the first 12 months, no more than 4 hours. Shoot will be in Monroe.

**Special Appearances:** One per quarter, up to four annually. These will be decided upon by Si and Korie and Willie Robertson based on their assessment of which events will be the most impactful and workable for Si. . . . [Chinook] to submit appearance suggestions to Dahlen for review with the family.

**Planning Meetings:** Two annual planning meetings with Robertson family members. Additional meetings will be handled by Dahlen team.

The Court must determine if DC failed to comply with the terms of Schedule B.

### i.      Content Development | Social Media

First, Chinook contends that DC did not comply with the section entitled "Content Development | Social Media." Cox testified that neither Uncle Si nor any Robertson family members ever created YouTube, Vine, or Snapchat videos. Nor did they create any customized welcome videos for Distributor Sales Pitches. Further, Chinook argues that Uncle Si never used his twitter account to tweet about the product.

Korie Robertson testified that the parties negotiated that Chinook, as the company in charge of marketing the product, was taking responsibility for performing social media and traditional advertising of the product. She testified that it was DC's understanding that Chinook would "take the lead" and make requests to Dahlen for assistance. Further, DC notes that Schedule B of the Agreement contemplates that "requests" will be made "to maximize Uncle Si's

time."

In Chinook's 2014 Marketing Plan it states that "Chinook USA will drive brand through clever social media content, consistent and on-brand posts, and 'ownership' of brand hashtags, etc. (e.g. #DrinkUncleSis #HeyMerica)." Additionally, Chinook then lists the same social media platforms contemplated in Schedule B as suggested platforms it intends to use for marketing.

Chinook also argues that while the Chinook-run Twitter account for Uncle Si tweeted about the product, Uncle Si never used his personal Twitter account to tweet about the product. Uncle Si testified that he did not own a Twitter account. Uncle Si's testimony supports DC's position that the parties intended to have Chinook run the social media accounts, since Uncle Si never had a platform to fulfill this obligation.

Chinook failed to provide evidence that DC refused a request under the section Content Development | Social Media. Therefore, Chinook is unable to carry its burden of proof that DC failed to perform an obligation under this section of Schedule B.

### ii. Media Interviews

Second, Chinook argues that DC breached Schedule B of the Agreement in failing to complete the requisite number of interviews to promote the product. On April 5, 2014, the product launched, and Robertson family members had until October 5, 2014, to complete "[u]p to ten 15 - minute interviews." As the Court noted in its Ruling on the cross-Motions for Summary Judgment [Doc. No. 66], the Agreement provision uses the language "up to," which suggests a maximum number and not a required minimum number of media interviews. *See, e.g.*, *Treischel v. Astrue*, No. 11–cv–242 JJK, 2012 WL 473467, at *13 (D. Minn. Feb. 14, 2012) (interpreting the words "up to" to indicate "an upper limit, or maximum"); *Terumo Americas*

*Holding, Inc. v. Tureski*, No. CV 14-13838-DJC, 2015 WL 4529746, at *4 (D. Mass. July 27, 2015) ("The ordinary meaning of 'up to' is one of limitation, implying a maximum cap or limit.").

The trial testimony established that Willie Robertson conducted one media interview specifically about Uncle Si's Iced Tea on the New York Stock Exchange.

On May 5, 2014, Chinook requested a CNBC interview with Willie Robertson to promote the tea the next day. Willie Robertson initially agreed to the interview when it was scheduled for Monroe, Louisiana, but declined when the location was changed to Shreveport, Louisiana, because of the distance he would have to travel on short notice. DC attempted to reschedule the interview for the following week, but the interview was never rescheduled or conducted.

Chinook only made two requests for media interviews. One interview was on short notice and the other was conducted by Willie Robertson. Chinook failed to provide any evidence of other requests made for media interviews. The Court finds that DC did not breach this provision of Schedule B by only conducting one interview when the language of the agreement sets no minimum number of media interviews, but instead limits the number of interviews "[u]p to ten 15 - minute interviews."

### iii.    Special Appearances

Next, Chinook argues that DC did not comply with the section entitled "Special Appearances." That section in the Agreement provides "[o]ne per quarter, up to four annually. These will be decided upon by Si and Korie and Willie Robertson based on their assessment of which events will be the most impactful and workable for Si. . . . [Chinook] to submit appearance suggestions to Dahlen for review with the family."

On April 25, 2014, Chinook requested Uncle Si's appearance at the Kentucky Derby held on May 3, 2014. Uncle Si declined the request due to an A&E filming conflict.

The evidence does not show Chinook made another request for an appearance until "early August" 2014 when it requested Uncle Si attend the National Association of Convenience Stores Show in Las Vegas. Bolls' internal email to others at DC explains that,

> Willie let me know that Si is unavailable to appear at the Vegas trade show and Chinook is upset, even though we told them not to count on it because it was a film day. You will all no doubt get calls and emails on this one. Here is the text David Salmon just sent Scott [Headington]. "Scott we have been asking for this date since early August. I must say we are very disappointed by this. . . ."

Instead, Willie Robertson attended the National Association of Convenience Stores in Las Vegas to promote Uncle Si's Iced Tea. The Agreement specifically states that Willie and Korie Robertson would have decision-making authority on what events to attend. Additionally, the Agreement stated that Chinook would "submit appearance suggestions to Dahlen for review with the family."

Chinook only provided evidence that it submitted two appearance suggestions. DC attended one of the only two requests made by Chinook. Further, the Court finds that it was reasonable for DC to decline the request for a special appearance at the Kentucky Derby on short notice. Under these circumstances, Chinook is unable to carry its burden of proof that DC failed to fulfill its obligations under this section of Schedule B.

### iv.    Planning Meetings

Finally, Chinook contends that DC did not conduct two annual planning meetings. However, Chinook failed to elicit testimony during the trial to support this contention.

The sole evidence Chinook has to support a violation of this provision is Cox's testimony on direct examination,

Q:      Did the Robertsons hold any planning meetings with you, two annual planning meetings? Did they do any annual meetings with you?

A:      There were no planning meetings. The only ones we had were towards the end of the relationship.

Willie Robertson was asked during cross-examination whether any planning meetings were conducted with Chinook. Willie Robertson stated that he wasn't sure, but did sit down with members of Chinook to discuss the actual making of the tea. Additionally, the Court notes that Cox testified that he participated in two meetings with representatives from DC in November 2014 and December 2014.

Chinook failed to provide evidence that it requested DC to attend planning meetings. Further, at least some meetings were conducted between the two parties. Therefore, Chinook has been unable to satisfy its burden to establish that DC violated the Endorsement provisions contained in Schedule B of the Agreement.

As stated above, in a breach of contract case, the burden of proof of the elements of recovery is on the plaintiff. *See Sam's Style Shop*, 694 F.2d at 1004. The Court finds that Chinook has failed to satisfy its burden as to DC's alleged breach of the Agreement.

### 2.      Good Faith and Fair Dealing

"Good faith performance is an implied requirement of every contract under Louisiana law." *Grisaffi v. Dillard Dep't Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995) (citing LA. CIV.

CODE art. 1983). A claim for breach of this implied covenant of good faith and fair dealing is based on the existence of an underlying contract. *See* LA. CIV. CODE. art 1983. Further, "[a] breach of the duty of good faith and fair dealing requires a breach of contract." *Schaumburg v. State Farm Mut. Auto. Ins. Co.*, 421 F. App'x. 434, 439 (5th Cir. 2011).

"In order to establish that [DC] breached an implied covenant of good faith in connection with [the Agreement], [Chinook is] required to prove that [DC] violated that agreement with a dishonest or morally questionable motive." *Barbe v. A.A. Harmon & Co.*, 705 So.2d 1210, 1220 (La. App. 4th Cir. 1998); *see also Fertel v. Brooks*, 832 So.2d 297, 306 n. 12 (La. App. 4th Cir. 2002) ("Bad faith is not the mere breach of faith in not complying with a contract, but a designed breach of it from some motive of interest or ill will.").

Regardless of what DC's motives may have been, the Court has already held, *inter alia*, that DC did not breach the Agreement at all. Therefore, Chinook has not demonstrated that DC breached any implied obligation of good faith and fair dealing. The Court finds that the evidence supports that DC acted in good faith in executing its part of the bargain. *See Heirs of Gremillion v. Rapides Parish Police Jury*, 493 So.2d 584, 587 (La. 1986) (implying that a party has acted in good faith unless it has acted in bad faith).

Further, none of the other Defendants were parties to the Agreement. Thus, there can be no claim for the breach of the duty of good faith and fair dealing against Dahlen Associates, 3292 Brands, Go-Time, and Checkered Flag. The Court finds that Chinook has failed to satisfy its burden as to its claim for breach of the duty of good faith and fair dealing against Defendants.

### 3. Fraud

In order to prove fraud, Chinook must show "(1) a misrepresentation, suppression, or

omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract." *Shelton v. Standard/700 Associates*, 798 So. 2d 60, 64 (La. 2001). While a fraud claim based on unfulfilled promises or statements as to future events will not satisfy the justifiable reliance requirement, a claim of fraud may be predicated on promises made with the intention not to perform at the time the promise is made. *Sun Drilling Prods. Corp. v. Rayborn*, 798 So.2d 1141, 1152 (La. App. 4th 2001). There must be an intent to defraud and actual or potential loss or damage. *Id.*

In order for the Court to determine whether DC made fraudulent misrepresentations to Chinook, the Court must examine the facts and decide whether DC simply made unfulfilled promises, or whether DC never intended to honor the alleged misrepresentations it made to Chinook.

Chinook claims that DC, along with 3292 Brands and Dahlen Associates acting as DC's agents, fraudulently induced Chinook to enter into the Agreement because Defendants knew or recklessly disregarded that the Robertson family's filming obligations would prevent DC from satisfying the endorsement provisions of the Agreement. Chinook contends that, despite the knowledge that filming the Robertson's television show would take first priority and would take up the majority of their availability, they agreed to perform numerous endorsement activities which DC knew they could not complete.

Chinook, however, has not provided any evidence to suggest that Defendants never intended to honor the endorsement provision. To the contrary, Korie and Willie Robertson both

testified that they intended to fulfill the requirements of the Agreement when it was executed.

Further, Chinook has been unable to show Defendants committed "a misrepresentation, suppression, or omission of true information." Korie Robertson testified that Chinook was aware of their filming obligations to A&E. Defendants also had a financial interest in the proper marketing and success of the product, and absent Chinook's assertions, there has been no evidence presented to conclude DC entered into the Agreement with the intent to cause damage to Chinook at DC's own expense. The Court finds that Chinook has failed to satisfy its burden as to its claim for fraud against Defendants.

### 4. Louisiana Unfair Trade Practices Act

Chinook also alleges that Defendant's conduct violated the Louisiana Unfair Trade Practices Act ("LUTPA"). *See* LA. REV. STAT. § 51:1405 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."). Chinook argues that Defendants committed unfair and deceptive acts in the conduct of trade and commerce when they fraudulently induced Chinook to execute the Agreement and when they knowingly breached the exclusivity provision of the Agreement.

To succeed on a LUTPA claim, a plaintiff must show that the defendant engaged in conduct that "offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 2010), 35 So.3d 1053, 1059 (internal quotations omitted). What constitutes an unfair trade violation is determined on a case-by-case basis. *Id.* "The range of prohibited practices under LUTPA is extremely narrow," however, and there is "a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Cargill,*

*Inc. v. Degesch Am., Inc.*, 875 F.Supp.2d 667, 676–77 (E.D. La. 2012) (citing *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993)). LUTPA does not provide an alternate remedy for a breach of contract claim. *Turner*, 989 F.2d at 1422 (internal citations omitted). Indeed, "only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA," *Cheramie Servs.*, 35 So.3d at 1060, and this "egregiousness" often involves "the breach of a special relationship of trust." *Cargill*, 875 F. Supp. 2d at 677.

First, Chinook contends that Defendants fraudulently induced Chinook to enter into the Agreement, because Chinook was unaware that DC had prior commitments to A&E. As the Court previously stated, *inter alia*, Defendants did not fraudulently induce Chinook to enter the Agreement because the A&E filming commitment was disclosed during negotiations. Even assuming that the A&E commitment was not disclosed, the conduct and circumstances of this case do not rise to the "extremely narrow" range of prohibited practices under the LUTPA.

Next, Chinook argues that DC violated the LUTPA when it knowingly breached the exclusivity provision of the Agreement. Chinook has been unable to satisfy its burden of proof that DC breached the exclusivity provision of the Agreement. Further, even if the Court were to believe DC was motivated to breach the contract by accepting offers from Go-Time and Checkered Flag, that fact would not alter the analysis. *See Rogers v. Brooks*, 122 F. App'x. 729, 733 (5th Cir. 2004) (no LUTPA violation where defendant breached contract to take advantage of better offer). The Court finds that Chinook has failed to satisfy its burden as to its claim for violations of the LUTPA by Defendants.

### 5. DC's Breach of Contract Claim Against Chinook

On, March 31, 2016, DC asserted a counterclaim for breach of the Agreement against Chinook. [Doc. No. 14]. However, in closing arguments, DC admitted that it failed to present any evidence concerning its counterclaim and had abandoned the counterclaim against Chinook. Therefore, the Court will enter Judgment in favor of Chinook as to DC's counterclaim.

## CONCLUSION

For the reasons set forth above, Judgment will be entered in favor of Defendants and against Chinook as to Chinook's claims against Defendants. Further, Judgment will be entered in favor of Chinook and against DC as to DC's counterclaim.

MONROE, LOUISIANA, this 28th day of June, 2017.

**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**